**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

L. DEAN LUKE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

IKON OFFICE SOLUTIONS INC., in its capacity as sponsor and plan administrator for the IKON Office Solutions, Inc. 1991 Deferred Compensation Plan; and the IKON OFFICE SOLUTIONS, INC. 1991 DEFERRED COMPENSATION PLAN f/k/a the Alco Standard Corporation 1991 Deferred Compensation Plan,

Defendants.

Civil No. 00-2755 (JRT/FLN)

**MEMORANDUM OPINION AND ORDER**

---

William Michael, Jr., DOUGLAS A. KELLEY, P.A., Centre Village Offices, Suite 2530, 431 South Seventh Street, Minneapolis, MN, 55415, for plaintiff.

Joseph J. Costello, MORGAN, LEWIS & BOCKIUS LLP., 1701 Market Street, Philadelphia, PA, 19103-2921, Daniel C. Gerhan, FAEGRE & BENSON LLP, 2200 Wells Fargo Center, 90 South Seventh Street, Minneapolis, MN, 55402-3901, for defendants IKON Office Solutions Inc. and the IKON Office Solutions Inc. 1991 Deferred Compensation Plan.

Plaintiff L. Dean Luke, for himself and on behalf of others similarly situated, brings this class action against defendants IKON Office Solutions Inc. ("IKON") and the IKON Office Solutions 1991 Deferred Compensation Plan (the "Plan") under the

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD.
DEPUTY CLERK

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover benefits under a life insurance policy issued pursuant to the terms of the governing Plan. This matter is before the Court on plaintiff's motion for partial summary judgment as to liability and defendants' motion for summary judgment. For the reasons that follow, plaintiff's motion is granted and defendants' motion is denied.

## BACKGROUND

In the fall of 1990, Alco Standard Corporation ("Alco"), now known as IKON Office Solutions, established the 1991 Deferred Compensation Plan for the benefit of certain highly compensated employees. The Plan, which is also known as a "top hat" plan, was designed to provide retirement and life insurance benefits in exchange for the employee's deferral of a portion of his or her compensation and payment of specified life insurance costs. According to the Plan, deferrals and payments to secure the specified benefits were to proceed as follows:

> Generally, your Employer will deduct from your compensation, through payroll deduction in equal monthly installments, the amounts shown in Appendix A as necessary to purchase the Retirement Benefits and Life Insurance Benefits you select under Option I, Option II, or Option III of the Plan.
>
> You must make payments for the cost of the Life Insurance Benefits, in amounts set forth in Appendix A, commencing on January 1, 1991 and continuing until you reach age 65, or, if later, until you retire.

Plan & Prospectus at 2. Under the Plan's provisions for life insurance benefits,[1] Alco agreed to purchase a life insurance policy for each eligible participant pursuant to a "split-dollar arrangement," whereby the participant and Alco agreed to split the benefits associated with the life insurance policies as well as the costs of such benefits. Upon the later of a participant's retirement or age 65, Alco agreed to transfer ownership of a life insurance policy on his or her life to the participant. The Plan describes the life insurance benefits associated with the Plan as follows:

> Life Insurance Benefits
>
> One or more life insurance policies will be purchased pursuant to a "split-dollar arrangement" between you and Alco, whereby you and Alco agree to split the benefits associated with the life insurance policies, as well as the costs of such benefits. Life insurance will be owned by Alco until the later of 1) the date you retire or 2) the date you attain age 65.
>
> * * * *
>
> On the later of the date you retire or reach age 65, if you are vested, the Employer will transfer ownership of, and distribute to you, a life insurance policy purchased pursuant to the split-dollar arrangement. The cash value of the life insurance policy, and the amount of the death benefit payable under the life insurance policy distributed to you are set forth in Appendix A.

Plan & Prospectus at 4.

With respect to the amount and timing of the life insurance benefits, the Plan explained that "upon the later of reaching age 65 or retiring, a vested Participant who has paid all required life insurance costs shall be entitled to receive a distribution of the life insurance purchased under the Split Dollar Arrangement. The value of such life

[1] It is undisputed that only the life insurance benefits are at issue in this case.

insurance is set forth in Appendix A." Plan & Prospectus at 11, ¶ 6. Appendix A then lists the promised retirement and life insurance benefits under three different options:

**Retirement and Life Insurance Benefits**

| Option I | Option II | Option III |
|---|---|---|
| $8,000/Year for 10 Years and $50,000 Cash Value Life Insurance Policy with Paid-Up Death Benefit of $200,000 | $15,000/Year for 10 Years + $95,000 Cash Value Life Insurance Policy with Paid Up Death Benefit of $375,000 | $22,000/Year for 10 Years + $140,000 Cash Value Life Insurance Policy with Paid-up Death Benefit of $550,000 |

Appendix A also includes a schedule of participant payments which describes the deferral and life insurance payments due in order to obtain the level of benefits stated in the option selected.

In that fall of 1990, the company scheduled presentations to take place across the country to provide information to prospective Plan participants regarding the 1991 Compensation Plan. William Bauer ("Bauer"), the Plan Administrator, conducted these presentations with the assistance of representatives of Marsh & McLennan National Marketing Corporation, a benefits consulting firm. Luke attended Alco's presentation at the Intercity Paper office in Minneapolis, Minnesota on October 2, 1990. During the meeting, Luke received a copy of the Prospectus for the Plan dated September 12, 1990 as well as the Plan itself. In addition, important provisions of the Plan were explained, including the deferral, vesting, benefits levels, life insurance benefits and the return on investment. According to Bauer's deposition testimony, he did not define the term "paid up" at the meeting, but did inform eligible participants that they would be required to pay the policy premiums until age 65 or their later retirement. Bauer testified that he did not inform the participants that after 65 or later retirement they would be required to make

continued insurance premium payments to insure that the policy maintained its death benefit. Bauer Dep. at pp. 53, 55-56.

On November 21, 1990, Luke entered into a written participation agreement with Alco. He selected Option II under the Plan and authorized Alco to take all required salary deferrals from his compensation for a five-year term. At the same time, Luke and Alco also signed a Split-Dollar Insurance Agreement and applied for a life insurance policy through Metropolitan Life Insurance Company ("MetLife"). MetLife accordingly issued its policy covering Luke to Alco on or about January 1, 1991.

Luke retired in May 1994 at the age of 62. Although Luke had not yet completed five years of deferrals pursuant to the vesting provisions of the Plan, he and the company entered into a Modified Deferral Agreement which required him to continue paying the insurance premium payments under the Plan until age 65. Upon doing so, the agreement promised that Luke "shall be entitled to all rights and benefits and shall have all of the obligations set forth in the Plan and other agreements under this Plan." Accordingly, Luke continued to pay the required life insurance premiums until his 65th birthday on May 22, 1997.[2] Shortly thereafter, Luke received MetLife policy number 9170233U (the "Policy") from IKON. The Policy was labeled as a flexible premium adjustable life insurance policy with a specified face amount coverage of $280,000 and an adjustable death benefit. According to the policy, the death benefit was the face amount plus the

[2] Luke's contemporaneous handwritten notes from a telephone conversation with Bauer in November 1996 indicate that Bauer told him that after reaching age 65, he should not send in any more insurance premiums and that he would receive a paid-up death benefit of $375,000. Luke Dep. at 86-88.

accumulation fund on the date of death. At the time of the transfer, the policy had an accumulated value of $95,000. The policy also contained a "final date" defined as January 1 of the year in which Luke reaches age 95.

After reviewing the Policy, Luke requested a benefit illustration from MetLife, which he received on September 22, 1997. The illustration projected both guaranteed and non-guaranteed values for the Policy by the policy year. MetLife explained that the "guaranteed values are based on 4% [interest rate] and guaranteed cost of term insurance rates." With respect to the non-guaranteed projections, MetLife made this disclaimer:

> All non-guaranteed benefits and values shown apply to the policy as illustrated and are not guaranteed. The assumptions on which they are based are subject to change by the insurer. Actual results may be more or less favorable.

Under the guaranteed-rate columns, the September 1997 policy projection indicated a guaranteed death benefit sliding from $345,000 in 1998 to $0 in policy year 16 (2007). Using its non-guaranteed 6.5% interest rate, MetLife projected that the policy's death benefit would fall below the $375,000 level in policy year 26 (2017).

Upon receipt of this information, Luke contacted IKON concerning the projected decline of his death benefit below the $375,000 level stated in Appendix A. In a July 6, 1998 letter, IKON's Director of Risk Management Walter J. Hope told Luke that the policy conformed to the provisions of the 1991 Plan "[o]n a current basis and into the foreseeable future." In a subsequent letter, IKON assured Luke that it would "continue to monitor policy values for adequacy" given the "'long term' nature of the Plan." IKON further stated that it was "evaluating a variety of strategies to assure that Participants'

policies continue to conform to the terms of the Plan." On July 18, 1998, Luke wrote back, stating:

> We are simply asking for the $375,000 paid up death benefit, as per Appendix A, which was presented to all of us in the 1991 Deferred Payment Plan and you did not resolve this in your letters.

In a July 31, 1998 response, IKON again assured plaintiff of its ongoing evaluation of various strategies to insure continued compliance with the Plan and restated its plan to communicate results of its study to participants in the early Fall of 1998. IKON next communicated with plaintiff by letter dated October 7, 1998. In that letter, IKON informed Luke that the communication planned for September had been preempted by other business considerations. IKON assured Luke, however, that further internal discussion will take place and that they would relate any relevant information to him as soon as it became available.

In February 1999, Luke received a 1998 annual statement for the Policy. The statement informed Luke that "assuming guaranteed maximum insurance and expense charges and guaranteed minimum interest rates, if you paid no further premiums, your policy would end July 1, 2009." MetLife further informed Luke that "[s]ince your last annual report MetLife has reduced interest rates. These changes may affect your policy values." During the summer of 1999, Luke requested a second benefit illustration from MetLife. Like the first illustration, the statement demonstrated that, unless Luke made additional premium payments, his death benefit would fall below the amount specified in Appendix A, and at a certain point, could vanish completely.

Luke filed a claim with the Plan Administrator on or about April 24, 2000, demanding that the Plan provide him with a "life insurance benefit consisting of a $95,000 cash value life insurance policy, with a paid-up death benefit of $375,000." On June 6, 2000, Luke received a letter from Hope denying his claim. The letter provides, in relevant part:

> First, in August of 1997, when the Policy was "split" and issued to you, it had a cash value in excess of $95,000. As a result, the distribution of the Policy with that cash value amount satisfied the Company's obligations under the Plan as outlined in Paragraph 6 of the Plan, providing for a distribution of life insurance upon the later of reaching age 65 or retiring, with a specified cash value.
>
> Second, the Plan did not obligate the Company to increase the value of your Policy with respect to the paid-up death benefit when the Policy was issued to you. To date, you have received all benefits due you under the Plan, including distribution of annual payments and the distribution of the life insurance policy with the specified minimum cash value.

Plaintiff appealed the denial of his claim, but it was denied on September 22, 2000. Three months later, Luke commenced this action under ERISA, 29 U.S.C. § 1132(a)(1)(B), which provides that a beneficiary of a plan may sue "to recover benefits due to him under the terms of his plan [or] enforce his rights under the terms of the plan." On December 28, 2001, the parties entered a joint stipulation and order regarding class certification. It provides for the following class definition:

> All Plan participants who became fully vested in the life insurance benefits promised by the Plan and to whom a life insurance policy was transferred upon the commencement of benefits under the Plan at the later of the participant's retirement or attaining age 65.

Stipulation at ¶ 4 [Docket No. 33].

Subsequently, Luke filed a motion for partial summary judgment and defendants moved for summary judgment. Luke contends that the Plan plainly and unambiguously promised a "paid up death benefit" in the amounts stated in Appendix A, which means, in its plainest terms, that the amount guaranteed is fully paid for. Defendants claim they are entitled to summary judgment for two reasons. First, the Plan Administrator's decision to deny Luke the benefits he requests is not arbitrary and capricious and therefore should be upheld. Second, defendants contend that Luke's claim is barred by the two-year statute of limitations.

## ANALYSIS

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See id.* Summary judgment is to be granted only where the

evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *See Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *See Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir. 1981).

**II. Denial of Benefits**

At issue in this case is the Plan's interpretation of the term paid up death benefit. As previously stated, the Plan provides that

> on the later of the date you retire or reach age 65, if you are vested, the Employer will transfer ownership of and distribute to you, a life insurance policy purchased pursuant to the split dollar arrangement. The cash value of the life insurance policy, and the amount of the death benefit payable under the life insurance policy distributed to you are set forth in Appendix A.

Appendix A then states that a participant who selected Option II and who paid all premiums required under the Plan, is entitled to a cash value life insurance policy of $95,000 with paid up death benefit of $375,000. Defendants have concluded that the provisions of the Plan only required that the policy provide the specified amounts in Appendix A at the time of transfer.

After that, it is plaintiff's obligation to maintain the death benefit at the level specified in the Plan.

**A. Standard of Review**

Although ERISA itself does not provide a standard of review, the Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the plan confers discretion on the plan administrator, a deferential abuse-of-discretion standard of review applies. *Bounds v. Bell Atlantic Enterprises Flexible Long-Term Disability Plan*, 32 F.3d 337, 339 (8th Cir. 1994). Courts apply the abuse-of-discretion standard only if the plan contains "explicit discretion-granting language." *Id.*

In this case, there is no dispute that the 1991 Deferred Compensation Plan confers discretion on the Plan Administrator to interpret the provisions of the Plan. Section 14 of the Plan provides that "[t]he Administrator shall be one or more persons who shall be responsible for: . . . (c) interpreting the provisions of the Plan." Accordingly, the Court shall review the Plan Administrator's denial of benefits under an abuse of discretion standard.

**B. Interpretation of the Plan**

Under an abuse of discretion standard, the proper inquiry is whether the decision by the plan administrator to deny benefits is reasonable. *Donaho v. FMC Corp.*, 74 F.3d 894,

899 (8th Cir. 1996); *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637 (8th Cir. 1997). The reasonableness of a plan administrator's interpretation is assessed by whether the decision to deny benefits is supported by substantial evidence, that is, more than a scintilla but less than a preponderance of the evidence. *Milone v. Exclusive Healthcare Inc.*, 244 F.3d 615, 618 (8th Cir. 2001). During this inquiry, the Court "consider[s] only the evidence before the plan administrator when the claim was denied." *Id.* (quoting *Sahulka v. Lucent Technologies,* 206 F.3d 763, 769 (8th Cir. 2000)); *Collins v. Central States S.E. & S.W. Areas Health & Welfare Fund*, 18 F.3d 556, 560 (8th Cir. 1994).

The Eighth Circuit has identified five factors in determining whether a plan administrator's interpretation of the policy is reasonable. These factors are: 1) whether the interpretation is consistent with the goals of the plan; 2) whether the interpretation renders any language in the plan meaningless or internally inconsistent; 3) whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute; 4) whether the plan administrator has interpreted the provisions at issue consistently; and 5) whether the interpretation is contrary to the clear language of the plan. *Milone*, 244 F.3d at 619; *Finley v. Special Agents Mut. Benefit Ass'n*, 957 F.2d 617 (8th Cir. 1992); *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997); *Lickteig v. Business Men's Assurance Co. of America*, 61 F.3d 579, 583-84 (8th Cir. 1995). Though each factor is relevant, the Eighth Circuit has observed that "significant weight should be given to a misinterpretation of unambiguous language in a plan." *Lickteig*, 61 F.3d at 585.

Turning first to the fifth *Finley* factor, the Court concludes that the Plan Administrator's interpretation of the term "paid up death benefit" was contrary to the clear

language of the Plan. Defendants argue that it completely satisfied its life insurance obligations under the Plan when, in August 1997, it transferred a life insurance policy to Luke with a cash value of $95,000 and a paid up death benefit of $375,000. Defendants thus claim that, because the policy participants received provided these benefits on the date of transfer, they satisfied their promise of benefits under Appendix A. In other words, if Luke had chosen to cash in the policy, he would have received at least $95,000 in cash; if Luke had died on that date, his beneficiary would have received the promised death benefit of $375,000 on the date of transfer.

The Court simply cannot agree that this interpretation comports with the clear language of the Plan. It is well established that ERISA plan terms must be accorded their ordinary, not specialized, meanings. *Wilson v. Prudential Ins. Co of America*, 97 F.3d 1010, 1013 (8th Cir. 1996); *Brewer v. Lincoln Nat'l Life Ins. Co.*, 921 F.2d 150, 154 (8th Cir. 1990). In this case, the Plan promised Luke a "paid up death benefit" of $375,000 upon reaching age 65. In simplest terms, the plain meaning of the term "paid up" means just what it says—that the object in question, in this case, the death benefit, is fully paid for. Webster's Dictionary defines "paid up" as something "that has satisfied or indicated an implied financial obligation." *Webster's Third New International Dictionary* 1620 (1986). This definition is also wholly consistent with the Eighth Circuit's observation in *Columbian Nat. Life Ins. Co. v. Griffith*, 73 F.2d 244 (8th Cir. 1934) that "in simple language . . . 'paid up insurance' means insurance which has been fully paid for." *Id.* at 246. Contrary to defendants' insistence, the Court finds other terms incorporating the phrase "paid up" such as "paid up policy" and "paid up insurance" highly relevant in determining the meaning of paid up death benefit in this case.

Both phrases have been interpreted to mean insurance for which, at a certain point in time, no additional premiums are owed. Defendants have not provided the Court with any principled basis why paid up death benefit should be interpreted any differently. In fact, the record indicates that even Hope has used the terms paid up insurance and paid up death benefit interchangeably.

The Court also finds no evidence in the Plan that plaintiffs would be required to continue paying premiums to maintain the death benefit level specified in the Plan. Indeed, the contrary is true. The Plan expressly told participants: "You must make payments for the cost of the Life Insurance Benefits, in amounts set forth in Appendix A, **commencing on January 1, 1991 and continuing until you reach age 65, or, if later, until you retire."** Plan & Prospectus at 2 (emphasis added). This clause clearly sets forth a defined period of time during which participants were required to make premium payments in order to obtain the paid up death benefit promised in the Plan. The Court cannot imagine that any plan participant reading the plan language would interpret it any other way, much less that the benefit would be guaranteed only upon the millisecond of transfer. That interpretation simply does not square with the plain meaning of the term paid up death benefit. Indeed, defendants' interpretation renders the words "paid up" all but meaningless if, as defendants contend, it requires continued payments to maintain the benefit. For these reasons, the Court finds the Plan's interpretation was contrary to the clear language of the plan.

Regarding the remaining *Finley* factors, the Court first considers whether the Plan Administrator has consistently interpreted the relevant terms of the Plan. The Court also finds this factor weighs in favor of plaintiff. In various letters, IKON assured Luke that the

company is continuing to monitor the policy and evaluate strategies to ensure that the policy remains consistent with the terms of the Plan. These assurances and continued involvement after the date of transfer contradict defendants' conclusion that its obligations under the Plan were satisfied upon transfer of the policy.

Defendants' interpretation also contravenes the Plan's goals. One of the Plan's express purposes is to provide participants with "survivor protection both before and after retirement." Plan & Prospectus at 9. By interpreting the term "paid up death benefit" as limited to the moment of transfer, defendants jeopardize the survivor benefits intended for beneficiaries of deceased plan participants. According to several benefit illustrations, the death benefit will not only fall below the amounts specified in Appendix A, but could lapse entirely, unless plaintiffs make additional premium payments. The Eighth Circuit has previously concluded that a plan administrator's interpretation is not consistent with the goals of the Plan where it erroneously deprives participants of the benefits which would otherwise be due them under the ambiguous terms of the Plan. *Lickteig*, 61 F.3d at 585.

The final *Finley* factor, whether defendants' interpretation conflicts with the substantive or procedural requirements of ERISA, does not weigh against defendants. Nonetheless, this factor is not sufficient to overcome defendants' erroneous interpretation of the unambiguous provisions of the Plan. *Lickteig*, 61 F.3d at 585 ("These two factors [that do not weigh against defendants] are insufficient to overcome the fact that Central States' interpretation runs contrary to the clear language of the Plan"); *Lockhart v. United Mine Workers of America 1974 Pension Trust*, 5 F.3d 74, 78 (4th Cir. 1993); *Davis v. Burlington Indus., Inc.*, 966 F.2d 890, 895 (4th Cir. 1992); *Callahan v. Rouge Steel Co.*,

941 F.2d 456, 460 (6th Cir. 1991). The Court therefore concludes that the defendants' denial of benefits as it relates to the life insurance benefits was an abuse of discretion.

## III. Statute of Limitations

Defendants next argue that summary judgment is warranted because Luke's claim is time-barred by the two-year statute of limitations. Specifically, defendants claim that Luke became aware of his claim when he received an explanatory memorandum from IKON on November 24, 1997 regarding benefits under the Plan. In the letter, Hope states that "[a]t the point of transfer, the Participant's policy has the death benefit and the accumulation value specified in Appendix A of the Plan and Appendix A of the Participation Agreement," and that "[w]ith the transfer of this policy, IKON's obligation under the life insurance benefit of the Plan is complete." Defendants contend that this memorandum gave Luke clear notice of the injury he claims and therefore his claim accrued on that date. However, because he did not file his complaint until December 22, 2000, defendants claim the action is time-barred.

ERISA does not contain its own statute of limitations period. *Adamson v. Armco, Inc.*, 44 F.3d 650, 652 (8th Cir. 1995). As a result, courts must borrow the most analogous state statute of limitations. *Id.* There is no dispute that the two-year statute of limitations contained in Minn. Stat. § 541.07(5) applies in this case. *Id.* at 652-53; *Cavegn v. Twin City Pipe Trades Pension Plan,* 223 F.3d 827, 830 (8th Cir. 2000) (applying two-year statute of limitations from Minn. Stat. § 541.07(5) to plaintiff's ERISA claim).

Although courts look to state law for determining the applicable statute of limitations period, federal common law controls the question of claim accrual. *Bennett v.*

*Federated Mutual Ins. Co.*, 141 F.3d 837, 838 (8th Cir. 1998). As a general rule, a cause of action under ERISA accrues "after a claim for benefits has been made and has been formally denied." *Union Pacific R.R. Co. v. Beckham,* 138 F.3d 325, 330 (8th Cir. 1998). But the Eighth Circuit has recognized an exception to this general rule:

> [A]n ERISA beneficiary's cause of action accrues before a formal denial, and even before a claim for benefits is filed, "when there has been a repudiation by the fiduciary which is *clear* and made known to the beneficiar[y]."

*Id.* at 330 (quoting *Miles v. New York State Teamsters Conf. Pension & Ret. Fund Employee Pension Benefit Plan,* 698 F.2d 593, 598 (2d Cir. 1983)); *Cavegn,* 223 F.3d at 830.

The Court concludes that Luke's claim is not time-barred by the governing statute of limitations. First, the November 24, 1997 memorandum is not so clear and unequivocal as to amount to a clear repudiation of a right to benefits. The purpose of the memorandum was "to address a number of common questions regarding the split dollar transaction." The memorandum also states at one point that "even with no further premium or cash accumulation contributions, the policy should meet or exceed the levels listed in Appendix A of the Plan." The memorandum concludes by saying that the letter "is intended to give you a 'head start' in understanding the policy transferred to you by IKON" and "is not intended to be a complete analysis." The letter thus contains sufficient ambiguity to preclude finding a clear repudiation of Luke's right to the benefits in question. Moreover, in letters dated July 7, 1998 and July 31, 1998, Hope told Luke that IKON, in conjunction with NBG and Metropolitan, is currently "evaluating a variety of strategies to assure that Participants' policies continue to conform to the terms of the

Plan, [and] that he expects the results of the evaluation to be available at the end of August and communicated to affected Participants shortly thereafter." On October 7, 1998, Hope again told Luke that IKON "continue[s] to monitor policies provided to Plan Participants under the 'split dollar' life insurance arrangement." The Court finds the assurances in these letters sufficient to lull plaintiff into believing that the matter would be resolved privately, without resorting to litigation. The Court thus concludes that the general rule for claim accrual applies and therefore Luke's filing of the complaint three months after the denial of his administrative appeal was timely.

**ORDER**

Based upon the foregoing, the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment [Docket No. 36] is **DENIED**.

2. Plaintiff's motion for partial summary judgment [Docket No. 45] is **GRANTED**.

DATED: Aug. 1, 2002
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge